612 N.E.2d 174 (1993)
In the matter of E.H. and L.H., Children Alleged to Be in Need of Services.
Thomas B.H., Appellant-Respondent,
v.
MARION COUNTY DEPARTMENT OF PUBLIC WELFARE, Appellee-Petitioner, and
D.S., Additional Appellee.
In the matter of the Termination of the Parent-Child Relationship of L.H. and E.H., Minors, and Thomas B.H.
THOMAS B.H., Appellant-Respondent,
v.
MARION COUNTY DEPARTMENT OF PUBLIC WELFARE, Appellee-Petitioner, and
D.S., Additional Appellee.
No. 49A02-9012-CV-739.
Court of Appeals of Indiana, Second District.
April 14, 1993.
Rehearing Denied May 17, 1993.
*176 Margaret Hills, Frankfort, KY, for appellant-respondent Thomas B.H.
Mary Jane Norman, Marion County Dept. of Public Welfare, Indianapolis, IN, for petitioner-appellee Marion County Dept. of Public Welfare.
M. Kent Newton, Leah S. Mannweiler, Krieg DeVault Alexander & Capehart, Indianapolis, IN, for additional appellee D.S.
SULLIVAN, Judge.
On January 5, 1990, the Marion County Superior Court, Juvenile Division, found E.H. and L.H. to be Children in Need of Services (CHINS) upon the ground that Thomas B.H. (Father) had sexually abused them during visitation in Indiana pursuant to a divorce decree issued in the District Court of Harris County, Texas. On September 7, 1990, the Juvenile Court entered a dispositional order strictly curtailing Father's visitation rights with the children. On February 21, 1992, the Juvenile Court terminated Father's parental rights in a separate action upon the basis that the conditions leading to the CHINS determination were unlikely to be remedied.
Father challenged the CHINS and the termination proceedings in separate appeals. This court consolidated the appeals under the above referenced cause number. In all, Father presents nine issues for review. Because we find the first issue dispositive, however, we address only the question whether the Juvenile Court properly exercised jurisdiction over the proceedings in light of the prior Texas custody determination and the Texas Court's exercise of continuing jurisdiction over visitation matters.[1]
We reverse.
On January 19, 1988, D.S. (Mother) and Father were divorced in the District Court of Harris County, Texas, 308th Judicial District, pursuant to a consensual divorce decree. Two girls had been born of the marriage: E.H., who was four at the time of the divorce, and L.H., who was two. The custodial disposition of the divorce decree named both parties "Joint Managing Conservators" over the children.[2] However, the decree awarded "primary custody and control", including the right to possession of the children and the right to establish a legal domicile, to Mother while granting Father visitation rights as mutually agreed by the parties, or failing that, pursuant *177 to a specific schedule. The schedule empowered Father to visit the children twice over the summer for one and two weeks respectively, during Easter vacation for one week, over the Christmas holiday every other year, and by arrangement whenever he was in Indianapolis (where Mother planned to reside with the children).
Father exercised his visitation rights in accordance with the divorce decree twice in the summer of 1988, and over a four-day period in October 1988, when he was in Indianapolis. After the October visit, Mother suspected Father of sexually abusing the children. Therefore, on November 10, eleven days after the visit had ended, she took the children to Dr. Charles Hasbrook, the children's pediatrician. Hasbrook was unable to find physical evidence to corroborate Mother's allegations; however, he reported Mother's concerns to The Department of Public Welfare, Child Protective Services Division (The Department).[3]
On November 15, two representatives from the Department interviewed the children. Beverly Rifleman, one of the representatives, filed a report which concluded:
"Caseworker is going to indicate sexual abuse based on the actions of the child during the interview and also based on what mother has told caseworker. There is nothing that caseworker can substantiate but has a strong feeling that the children have evidently experienced some things with father they wish not to talk about. It appears they [sic] may perhaps have been some form of sexual fondling." Record at 1808.
Notwithstanding her "strong feeling", Rifleman closed the case at that time due to a lack of evidence.
On December 9, Mother petitioned the Harris County District Court to modify the divorce decree to suspend Father's visitation rights with the children, or alternatively, to restrict his right to supervised visits. The petition alleged that the Texas court:
"has acquired and retains continuing jurisdiction of this suit and of the children the subject of this suit in so far as such jurisdiction relates to the modification of periods of access and possession as specified by the terms of the order to be modified, as as [sic] result of prior proceedings." Record at 149-50.
The Texas Court heard evidence upon the petition for two days and took the matter under advisement. On December 16, Father filed a counter-claim for modification of visitation and support. The Texas court talked with the parties' attorneys in chambers and was prepared to order Mother to produce the children for a supervised Christmas visit in Houston when Mother requested that the court non-suit the case pursuant to Rule 162 of the Texas Rules of Civil Procedure. The court dismissed her claim, but retained jurisdiction over Father's counter-claims.
On December 19, 1988, Mother petitioned the Marion County Superior Court, Civil Division, in Indiana to modify the custody and visitation determinations established by the Texas divorce decree. The Superior Court set a hearing for April 19, 1989. Although the record is unclear as to the exact date of filing, Mother moved to dismiss Father's remaining claims in the Texas court sometime between December 19, *178 1988 and February 9, 1989, now alleging that the Texas court lacked jurisdiction over the dispute.
Pursuant to the original divorce decree still in effect, Father made plans to visit the children over the 1988 Christmas holiday, and informed Mother of the details of his arrival in Indianapolis. When he arrived, however, Mother had left the State with the children in order to prevent Father from visiting them. When Father returned to Texas he instituted contempt proceedings in the Texas District Court for Mother's willful violation of the terms of the divorce decree.
On March 2, 1989, Father returned to Indianapolis to exercise his visitation rights pursuant to the still unmodified divorce decree. Anticipating Mother's refusal to produce the children, Father brought with him an order of the Texas court dated March 1 restraining Mother from interfering with the visitation. Upon his arrival, however, Father was confronted with a CHINS petition which the Department had filed that morning with the Marion County Juvenile Court.
In addition to alleging the results of the November 15, 1988 interview, The Department's CHINS petition alleged incidents reported by Mother on November 17 and 22, 1988, and the evaluation of two psychologists. It further alleged  erroneously, so far as the record reveals  that Dr. Hasbrook had found contusions up and down E.H.'s legs at his November 10, 1988 examination, which E.H. reported were caused by Father pinching her, and slight irritation of L.H.'s labia.
Father moved to dismiss the action for lack of subject matter jurisdiction due to the Texas court's continued exercise of jurisdiction over the visitation issue. However, the CHINS court assumed jurisdiction to determine whether Father could take physical custody over the children for the purpose of the March 2 visit, noting that it would ultimately have to consider whether Indiana or Texas was the most convenient forum for the final determination of the matter. The court held a detention hearing later that afternoon, at which it limited Father's access to the children to supervised visits arranged by the Department until a fact-finding hearing could be conducted on April 25.
On March 28, the CHINS court held a pre-trial hearing at which the court's jurisdiction was at issue. The CHINS court informed the parties that the Marion County Superior Court, Civil Division, was willing to defer jurisdiction to the CHINS court, but that the Harris County District Court was reluctant to give up its jurisdiction primarily because the Texas court believed that the several days of evidence already heard involved the precise matter before the CHINS court. Since it was preparing to rule within the week upon a number of issues in the case, the Texas court requested that the CHINS court not rule or stay any ruling pending a Texas disposition. Notwithstanding this request, the CHINS court decided to exercise jurisdiction and proceed with the case, subject however to further discussions with the Texas court.
On April 6, The Texas court denied Mother's motion to dismiss for lack of subject matter jurisdiction. The next day, Mother petitioned the Court of Appeals for the First Supreme Judicial District of Texas for leave to file a petition for writ of mandamus ordering the Harris County District Court to refrain from exercising jurisdiction over the case.
On April 11, while the petition for leave was still pending, the Indiana CHINS court held a child competency hearing. Jurisdiction was discussed only in passing at the hearing; however, the CHINS court issued an order following the hearing in which it found that it had jurisdiction over the case. On April 12, the Texas Court of Appeals granted leave to file the petition for writ of mandamus, and on April 13, the CHINS court vacated a pending order to hold a jurisdictional hearing that had been scheduled for April 19.
On April 14, a hearing was held in the Harris County District Court in which Father sought, inter alia, to obtain an order from the court requiring Mother to produce the children for a visit with Father in Houston. *179 At the outset, Mother asked the court to continue the hearing pending the outcome of the petition for writ of mandamus before the Texas Court of Appeals. The court denied Mother's request, re-affirmed its continued exercise of jurisdiction, and stated its belief that the Indiana court was without jurisdiction.
At the close of the hearing, the Texas court expressed its intent to order Mother to produce the children for a visit in Houston supervised by Father's parents within the next few weeks. However, confronted with the fact that Mother's production of the children would violate the order of the Indiana CHINS court limiting Father's access to supervised visits arranged by the Department, the court requested that Father's counsel draft an order demanding the surrender and release of the children, and indicated that he would talk to the Indiana judge and "take care of the situation in Indiana." Record at 382. Although the details do not appear of record, it is apparent that Father did not in that time-frame visit with the children.
On April 25, the CHINS court held a hearing to determine the admissibility of L.H.'s and E.H.'s hearsay statements under the child hearsay statute. At the close of the hearing, Mother requested clarification of the court's position regarding the Texas court's attempt to order Mother to allow Father to visit the children. The court reaffirmed its position that Father's visitation rights were to be limited to supervised visits arranged by the Department, but encouraged the parties to arrange a visit. Upon the jurisdictional question, the court took the position for the first time (so far as the record reveals) that it had exclusive jurisdiction over the dispute, and noted that it had a disagreement with the Texas District Court upon the point. On June 21, the custody modification case pending in the Superior Court was consolidated with the CHINS action.[4]
On October 5, the Texas Court of Appeals denied Mother's petition for writ of mandamus in Hemingway v. Robertson (1989) 1st Dist.Tex. App., 778 S.W.2d 199. The court held that Indiana had jurisdiction over "custody" issues, as defined by the Texas Family Code, but that Texas retained jurisdiction over the issues of "visitation", child support, and attorney's fees. See footnotes 8 at page 182 and 19 at page 186, infra.
On January 4, 1990, after conducting a three-day fact-finding hearing, the CHINS court entered judgment that the children were CHINS. The judgment contained written findings of fact and conclusions of law, in which the CHINS court concluded that it had jurisdiction. On April 4, the court held a dispositional hearing, and on September 7, the court issued its dispositional findings and conclusions, in which it once again concluded that it had jurisdiction. In the accompanying dispositional order, the court ordered: 1) that Mother, Father and the children all participate in therapy coordinated through a primary therapist; 2) that Father complete a diagnostic evaluation at a sexual abuse clinic; 3) that any physical contact between Father and the children be conditioned upon the primary therapist's assessment either that Father had made significant progress in his treatment or that such contact would benefit the children; and 4) that Father have weekly telephone contact with the children so long as the children wished it, unless the children's therapist deemed it a disruptive influence upon them.
On October 12, Mother filed a contempt petition before the CHINS court alleging that Father was delinquent in his child support payments. On October 30, the court held a hearing at which it declined to hold Father in contempt for the time being, but asked the parties to brief the issue whether it had jurisdiction over monetary issues.
On April 30, 1991, the CHINS court issued an order in which it stated:

*180 "consistent with the best interests of the children, [the court] is hereby acquiring and assuming jurisdiction over issues related to [Father's] responsibility to pay child support and insurance related obligations under the terms of the Texas decree." Record at 1191.
On July 22, 1991, Mother filed a second contempt petition with the CHINS court alleging Father's failure to pay child support. On August 30, the court held a contempt hearing, and on September 17, it found Father in contempt for failing to pay an arrearage of $12,481.50 in child support payments as of April 30 and attorney's fees of $1,912.50 to Mother's attorneys. As a result of the contempt finding, the court issued a bench warrant for Father's arrest. On October 2, Father's attorney petitioned the court to withdraw his appearance. The court granted the petition the same day. On October 10, Father filed a praecipe in the Juvenile Court to initiate his appeal of the CHINS determination.
On October 29, 1991, the Department filed a Petition for Involuntary Termination of the Parent-Child Relationship in the juvenile court under a separate cause number. On January 22, 1992, the court held a hearing at which Father failed to appear. On February 21, following a hearing, the court entered a default judgment against Father and terminated his parental rights. Father appealed the judgment. Upon Father's motion, we consolidated the termination and the CHINS appeals.
Upon appeal, Father argues that the CHINS court was without jurisdiction to decide visitation issues. Father asserts that I.C. 31-1-11.6-1 et seq. (Burns Code Ed. 1987), Indiana's version of the Uniform Child Custody Jurisdiction Act (UCCJA),[5] vested the Texas court with subject matter jurisdiction over all visitation issues until that court agreed to relinquish its jurisdiction, and that the essence of the CHINS proceeding dealt with the visitation issue. As a result, Father argues that the CHINS court had no jurisdictional basis to affect his visitation rights or to hold him in contempt for failing to pay child support. Finally, Father argues that the termination of his parental rights is void because it was based upon the factual findings of the CHINS court and the termination court's conclusion that there was no reasonable probability that the conditions resulting in the CHINS determination would be remedied.
The Department responds that the CHINS court's jurisdiction was properly based solely upon I.C. 31-6-2-1.1 (Burns Code Ed.Supp. 1992), the CHINS statute, which vests the juvenile court with "exclusive original jurisdiction" over CHINS proceedings, and that the UCCJA is inapplicable to CHINS proceedings. In addition, the Department argues that the CHINS court, as a division of the superior court, had jurisdiction to reduce the child support arrearages to judgment. Finally, although the Department does not specifically address the point, it follows from the Department's position that the termination court would have been within its discretion in relying upon the CHINS proceedings and dispositional order in terminating Father's parental rights.
At the center of the dispute before us is the question whether in order to exercise jurisdiction, a CHINS court must comply with the requirements of the UCCJA when the CHINS proceeding addresses a "custody determination", as defined by the UCCJA. The question phrased conversely is whether a CHINS court may exercise jurisdiction without regard to the UCCJA when its jurisdiction is invoked under the CHINS statute. Our Supreme Court addressed this issue in In re Lemond (1980) 274 Ind. 505, 413 N.E.2d 228.
Lemond involved a contempt proceeding in which judges and attorneys were determined to have conspired to thwart the effect of a Court of Appeals opinion which *181 had been certified by our Supreme Court. That opinion ordered Earl Lemond (Lemond), father and custodial parent of Michelle Lemond (Michelle), to relinquish custody of Michelle to Jeanene McCormack (McCormack), the girl's mother. The order was based upon the court's interpretation of the UCCJA.
When McCormack attempted to take custody of Michelle, Lemond's attorney, with the help of a Pike Court Circuit Judge and a Special Judge, orchestrated the filing of a CHINS petition, which alleged that Michelle was emotionally unstable and afraid of McCormack, and that putting Michelle in McCormack's custody could inflict severe psychological damage upon her.
The Supreme Court held the judges and Lemond's attorney in indirect criminal contempt for putting McCormack through the trauma of a sham CHINS proceeding.[6] Before reaching this result, however, the court carefully discussed the jurisdictional relationship between the UCCJA and CHINS proceedings. The court first discussed the possibility of proceeding with the CHINS action within the framework of the emergency jurisdictional provision of the UCCJA (I.C. 31-1-11.6-3(a)(3)(B)). The court clearly approved of this method of establishing jurisdiction with regard to the CHINS issues, although it stressed that such jurisdiction was to be narrowly construed in Indiana. Lemond, supra, 413 N.E.2d at 244-45.
The court then discussed the possibility of invoking jurisdiction solely under the CHINS statute. It concluded, however, that many of the jurisdictional prerequisites for the filing of a CHINS petition and the handling of the initial hearing were not met in the case, and therefore, that the CHINS court should have dismissed the petition. Id. at 248-49.
Lemond could be read to suggest that the CHINS court would have had jurisdiction if the petition had been filed in good faith and if it complied with the jurisdictional requirements of the CHINS statute. However, a careful reading of the case reveals that such interpretation is unwarranted. In a footnote the court stated:
"These Courts permitted the Indiana Prosecuting Attorneys Association to file a brief amicus curiae. Amicus candidly admits that respondents may have failed to meet the jurisdictional prerequisites for invoking emergency juvenile court jurisdiction. The major concern amicus raises, however, is that our decision here will preclude an Indiana juvenile court from acquiring jurisdiction where there is an out-of-state decree. Of course, this is not the end result of this case, and our discussion of this issue should alleviate this concern.

Amicus also asserts that there may be a conflict between the emergency provision of the U.C.C.J.A. Ind. Code § 31-1-11.6-3(a)(3), and the juvenile court's exclusive original jurisdiction to handle emergencies under Ind. Code § 31-6-2-1. We think, however, that these two statutes can be given full effect without a conflict arising. Where two statutes deal with the same subject matter, they should be read together and construed so as to harmonize and give effect to each. [Citation omitted.] We agree with the following assertion found in the brief of amicus curiae:

`The provisions from both laws can be construed in pari materia to effectuate the similar policies of both if the juvenile court assumes temporary jurisdiction only for the duration of the emergency and terminates its jurisdiction after the emergency has passed. The jurisdiction in the juvenile court should be invoked only in a true emergency and should be exercised upon the receipt of sound evidence as to the nature of the emergency by the juvenile court order.' Brief of Amicus Curiae at 5." Id., 413 N.E.2d at 245-46 n. 15.
*182 This language clearly supports the conclusion that the CHINS court can and must exercise its jurisdiction within the framework and the policy considerations of the UCCJA. This conclusion is further supported by the Lemond court's concluding remark:
"The brief by amicus curiae questions whether the result of this contempt proceeding will be an unwillingness in trial judges to act, even in emergency case, [sic] where there is a valid and enforceable foreign custody decree. Of course, when probative, substantial and specific evidence of a clear emergency is presented to a juvenile court, the court should not hesitate to exercise jurisdiction pursuant to the appropriate statutes. Additionally, such jurisdiction could be properly exercised where, as here, an appellate court has found that a foreign custody decree should be enforced." Id., 413 N.E.2d at 249.
It is worth emphasizing that the court encouraged juvenile courts to exercise jurisdiction pursuant to the appropriate statutes (in the plural). We conclude that Lemond is persuasive, if not controlling, for the proposition that the UCCJA applies with full force in CHINS proceedings.[7]
The Department responds that the "exclusive original jurisdiction" language of I.C. 31-6-2-1.1 (Burns Code Ed.Supp. 1992), the general juvenile court jurisdiction statute, vested the juvenile court with exclusive jurisdiction over all issues in the CHINS proceeding to the exclusion of all other courts, including the Texas court. In support of this contention, The Department cites In re the Guardianship of Bramblett (1986) 2d Dist.Ind. App., 495 N.E.2d 798, 799 for the proposition that:
"no other Indiana court has jurisdiction to entertain any proceeding which in any way conflicts with the exclusive jurisdiction vested in the juvenile court by the commencement of a CHIN proceeding." See also P.B. v. T.D. (1987) 3d Dist.Ind. App., 504 N.E.2d 1042, 1043, trans. denied, citing the passage with approval.
In addition, the Department cites In re Guardianship of Thompson (1987) Ind., 514 N.E.2d 618, 620 for the proposition that:
"When a CHINS petition is properly filed, the jurisdiction of the juvenile court transcends the custodial situation of the child to provide for the emergency circumstances and need of care and protection contemplated by the CHINS procedures."
The Department further argues that exempting the exercise of jurisdiction under the CHINS statute from the limitations of the UCCJA is not contrary to the UCCJA's purpose of avoiding "childnapping" and forum shopping among the states for favorable custody determinations because only the Department or the prosecutor has standing to initiate CHINS proceedings. See I.C. XX-X-X-XX(a) (Burns Code Ed.Supp. 1992). The litigants to custodial issues are thus presumably excluded from the use of CHINS to achieve their own ends.
We note initially that the Bramblett language specifically states that no Indiana court may intrude upon the CHINS court's exclusive jurisdiction. The language was clearly not intended to control inter-state jurisdictional conflicts. Indeed, the cases cited by the Department do not address inter-state jurisdictional conflicts involving a foreign custody decree, and are therefore deemed not determinative of the issue before us.[8]
*183 Although it is true that the Department must have exercised independent judgment in deciding to file a CHINS petition, it can hardly be gainsaid upon this record that the petition was filed at the behest or at least with the on-going cooperation of Mother. In this regard, we note that the Department pursued the same remedy against Father that Mother had sought in all the prior proceedings, and that Mother's counsel in the CHINS proceedings consistently concurred in the positions taken by the Department and used his opportunity to examine the witnesses in order to buttress the Department's positions. In any event, even assuming arguendo that exempting the exercise of CHINS jurisdiction from the UCCJA would not vitiate the statute's goal of preventing forum shopping, it would undermine the Act's equally important purpose of avoiding "jurisdictional competition and conflict with courts of other states in matters of child custody", as the instant proceedings clearly demonstrate.[9] I.C. 31-1-11.6-1(a)(1); see Campbell v. Campbell (1979) 1st Dist., 180 Ind. App. 351, 388 N.E.2d 607, 610.
Finally, The Department's interpretation of the CHINS jurisdictional statute is inconsistent with the Parental Kidnapping Prevention Act (PKPA).[10] 28 U.S.C.A. § 1738A, (West Code Ed.Supp. 1992). The Department asserts, in effect, that the CHINS court may automatically exercise jurisdiction to the exclusion of all other courts when it files a petition alleging a child to be in need of services. However, subsection (a) of the PKPA provides:
"The appropriate authorities of every State shall enforce according to its terms, and shall not modify except as provided in subsection (f) of this section, any child custody determination made consistently with the provisions of this section by a court of another State." (Emphasis supplied.)
A "custody determination" includes any judgment or decree providing for the custody or visitation of a child. PKPA, subsection (b)(3). An initial child custody determination is consistent with the PKPA when, inter alia, the jurisdiction of a state court is invoked consistently with its own state law, and the state is the home state of the children on the date the proceeding is commenced. PKPA, subsection (c). Under subsection (f), a subsequently acting court may exercise jurisdiction to modify the custody determination of the court of another state only if the court making the initial determination no longer has jurisdiction under subsection (d) or declines to exercise continuing jurisdiction. Subsection (d) provides that once a custody determination has been made consistent with the PKPA, the jurisdiction of the court continues so long as it continues to have jurisdiction under its own state law and the child or any contestant remains in residence there. Thus, a court may not unilaterally modify a preexisting custody determination of another state (including a determination of visitation rights) without the latter's consent where, as here, the parties, including the children, resided in the other state when the determination was originally made and one of the parties continues to reside there.[11]
*184 We turn now to the application of the UCCJA to the CHINS statute. In general, a child is a CHINS if: 1) the child's mental or physical health or condition is seriously endangered; 2) the child is a victim of a sex offense, or is allowed to commit an obscene performance or sex offense; 3) the child endangers his or her own health or that of others; 4) the child is missing; or 5) the child is born with an addiction or suffers as a result of his or her mother's alcohol or drug addiction. I.C. 31-6-4-3 (Burns Code Ed.Supp. 1992); I.C. 31-6-4-3.1 (Burns Code Ed.Supp. 1992). Thus, the CHINS statute, including its jurisdictional trigger, is intended to enable the government to respond to emergency situations involving children unlikely to be helped without court intervention. Nevertheless, once CHINS jurisdiction is invoked, the court's jurisdiction continues until the child is twenty-one or the juvenile court discharges the child. I.C. 31-6-2-3 (Burns Code Ed. 1987) see I.C. XX-X-X-XX (Burns Code Ed.Supp. 1992); I.C. XX-X-X-X-XX (Burns Code Ed.Supp. 1992). Accordingly, what begins as a means of remedying an emergency situation may end up as a twenty-one-year-long exercise of control over the child's custodial situation.
The UCCJA provides a jurisdictional basis for a state to make custody determinations where the child is physically present in the state and "it is necessary in an emergency to protect the child because he has been subjected to or threatened with mistreatment or abuse or is otherwise neglected or dependent." I.C. 31-1-11.6-3(a)(3)(B). However, the state's discretion to exercise jurisdiction to modify a preexisting foreign custody decree is limited by I.C. 31-1-11.6-14. Although that section does not expressly provide authority for a court to modify a foreign decree in emergency circumstances, Lemond clearly contemplates this result, at least with respect to CHINS proceedings.[12]Lemond, supra, 413 N.E.2d at 245. However, Lemond emphasizes: 1) that child neglect without bona fide emergency circumstances  a term to be narrowly construed  is insufficient to confer emergency jurisdiction; and 2) that a parent's self-serving statements alone are insufficient to provide a factual basis for the exercise of such jurisdiction. Lemond, supra (citing State ex rel. Marcrum v. Marion County *185 Superior Court Civil Division, Room No. 5 (1980) 273 Ind. 222, 403 N.E.2d 806, 808). As the Lemond court concluded, the CHINS court should assume "temporary jurisdiction only for the duration of the emergency and [should terminate] its jurisdiction after the emergency has passed." Lemond, supra, 413 N.E.2d at 246 n. 15.
In cases where the CHINS court expects or hopes to exercise jurisdiction on an on-going basis during the minority of the child or over a period of time extending beyond the immediate emergency bringing the parties to court, the CHINS court must follow the usual procedures set forth in the UCCJA. Several Indiana cases have interpreted the provisions of the UCCJA, and there is no need for us to provide a summary of the statutory scheme here.[13] However, for our purposes, it is appropriate to make some relevant observations. The basic jurisdictional provision of the UCCJA is designed "with a flexibility which often results in the existence of jurisdiction over a child custody dispute in more than one state." (Emphasis supplied) In re Custody of Cox (1989) 3d Dist.Ind. App., 536 N.E.2d 520, 522; see I.C. 31-1-11.6-3 (Burns Code Ed. 1987). Nevertheless, the UCCJA is clear that there can be no concurrent exercise of jurisdiction between two states under the Act. Id. at 522-23; see I.C. 31-1-11.6-6 and I.C. 31-1-11.6-14 (Burns Code Ed. 1987).
The fundamental principle underlying the UCCJA is that once a court with a jurisdictional basis exercises jurisdiction over a "custody" issue, that court retains exclusive jurisdiction over all custody matters so long as a "significant connection" remains between the controversy and the state, and that court alone has discretion to decide whether it will defer jurisdiction to the court of another state upon the basis that the other court is a more convenient forum to litigate the issues.[14]Funk v. Macaulay (1983) 2d Dist.Ind. App., 457 N.E.2d 223, 226-27; Clark v. Atkins (1986) 3d Dist.Ind. App., 489 N.E.2d 90, 94, trans. denied; I.C. 31-1-11.6-6, -7, -13, and -14 (Burns Code Ed. 1987); PKPA, accord 28 U.S.C. § 1738A(d) and (f). A "significant connection" remains under the scheme as long as one parent continues to reside in the state rendering the initial determination. Clark, supra; Funk, supra; Cox, supra, at 523, see also PKPA 28 U.S.C.A. § 1738A(d). The court of the second state is encouraged to communicate with the court exercising jurisdiction to discuss which state may provide a more convenient forum for the litigation of the dispute. I.C. 31-1-11.6-7. However, a refusal by the court of continuing jurisdiction to defer jurisdiction over "custody" issues to the second court bars the second court from exercising jurisdiction unless the children and all the interested parties have left the state.[15]
*186 Not all of the dispositional alternatives available to the CHINS court affect "custody" issues, as defined by the UCCJA, and therefore, a CHINS proceeding need not involve a "custody determination", strictly speaking.[16] Nevertheless, as this case makes abundantly clear, the entirety of CHINS proceedings, from the filing of the initial petition to the final dispositional order, is likely to drastically affect the custodial and visitation rights of the parents in the typical case. Obviously, the primary intent of the CHINS statute is to protect children from the adverse effect of custodial unfitness or deprivation, and not simply to force the family to attend emergency psychological therapy. Therefore, we conclude that when confronted with existence of a valid foreign custody-visitation determination, the CHINS court must proceed under the provisions of the UCCJA. In light of these principles, we focus upon the instant case.
As a threshold matter, we address the question whether the Texas judgment is entitled to full faith and credit under I.C. 31-1-11.6-13 (Burns Code Ed. 1987), which provides:
"The courts of this state shall recognize and enforce an initial or modification decree of a court of another state which had assumed jurisdiction under statutory provisions substantially in accordance with this chapter or which was made under factual circumstances meeting the jurisdictional standards of this chapter, so long as this decree has not been modified in accordance with jurisdictional standards substantially similar to those of this chapter." [Emphasis supplied.][17]
In State ex rel. Marcrum v. Marion Superior Court, supra, 403 N.E.2d at 809, our Supreme Court specifically upheld the exercise of continuing jurisdiction by a Harris County, Texas, District Court without comparing Texas's statutory scheme with the UCCJA because the Texas court's exercise of jurisdiction on the facts of that case complied with the jurisdictional prerequisites of the UCCJA.[18]
In the instant case, all the parties lived in Texas when the divorce decree was entered, and Father has remained there throughout the Texas court's continued exercise of jurisdiction. Therefore, the CHINS court was bound to recognize the Texas decree and respect the Texas court's continued exercise of jurisdiction.[19] Thus, *187 we turn to the question whether the Marion County juvenile court had authority under the UCCJA to modify the Texas decree.
In general, foreign custody decrees may be modified only in accordance with I.C. 31-1-11.6-14. However, as discussed above, Lemond implicitly expanded I.C. 31-1-11.6-14 to allow a CHINS court to exercise jurisdiction in emergency circumstances pursuant to the authorization of I.C. 31-1-11.6-3(a)(3) when the party invoking the jurisdiction is able to meet the evidentiary burden of establishing a bona fide emergency. Such rationale is not available to the Department here, for no attempt was made by the CHINS court to justify its exercise of jurisdiction on that basis; nor has the Department made such argument on appeal.
In any event, to the extent that the CHINS determination might be premised upon an emergency which could only be established by events which were the subject of the Texas litigation, in the view of the author of this opinion, the Indiana judgment is invalid. Full faith and credit concepts dictate that Indiana not relitigate the very factual issues decided by the Texas court even though there is a formalistic difference between D.S. as the party to the Texas proceedings and the Department as a party to the Indiana proceedings. See footnote 5, supra. Furthermore, we discern from the record before us no facts different from or subsequent to the Texas decision which would permit an Indiana determination of a CHINS emergency. The matter as it existed in the posture before the CHINS court served to bar the Indiana determination upon grounds of issue preclusion, if not claim preclusion. Compare Raikos v. Nehring (1988) 2d Dist.Ind. App., 527 N.E.2d 1141 (full faith and credit considered as to Illinois judgment and with regard to issue preclusion) with Coulson v. State (1986) 1st Dist.Ind. App., 488 N.E.2d 1154, trans. denied (discussion of res judicata as embracing both issue preclusion and claim preclusion).[20]
The only allegation in the CHINS petition involving a fact occurring after the Texas hearing was the allegation that Richard Austin, a psychologist, had examined *188 the children and filed a report, which stated that there were "indicators which are consistent with children who have been `sexually or inappropriately sexually handled or abused'." Record at 53. The report, standing alone, falls far short of cognizable evidence which could arguably satisfy the Department's burden of establishing its allegations by a preponderance of probative evidence. See In re Matter of Joseph (1981) 4th Dist.Ind. App., 416 N.E.2d 857. Furthermore, there was no suggestion that the matters covered by the evaluation report were not, or could not be, litigated in the Texas proceedings.
As our Supreme Court has stated in interpreting I.C. 31-1-11.6-3(a)(3): "[o]ne express purpose of the UCCJA is to avoid the ... repeated relitigation of custody matters. Additionally, it is the intent of the legislature that proper custody decrees from other jurisdictions be enforced." Lemond, 413 N.E.2d at 228. The CHINS court was without an adequate factual basis to exercise jurisdiction under I.C. 31-1-11.6-3(a)(3).[21]
The next question is whether the CHINS court had authority to modify the Texas custody decree in accordance with I.C. 31-1-11.6-14 and the non-emergency provisions of the UCCJA. Clearly it did not.
I.C. 31-1-11.6-14(a) provides:
"If a court of another state has made a custody decree, a court of this state shall not modify that decree unless (1) it appears to the court of this state that the court which rendered the decree does not now have jurisdiction under jurisdictional prerequisites substantially in accordance with this chapter or has declined to assume jurisdiction to modify the decree and (2) the court of this state has jurisdiction."
As earlier stated, the Texas court's exercise of continuing jurisdiction was substantially in accordance with the UCCJA. Therefore, the CHINS court's authority to modify the Texas decree was limited to issues over which the Texas court declined to exercise jurisdiction or upon which Texas had deferred jurisdiction pursuant to the inconvenient forum provision of I.C. 31-1-11.6-7.
The Texas Court of Appeals effectively deferred jurisdiction over "custody" matters, as defined by Texas Family Code § 11.52(10), to Indiana while upholding the Texas District Court's exercise of continuing jurisdiction over "visitation" issues.[22]Hemingway, supra, 778 S.W.2d at 201-02. Inasmuch as Mother had already been awarded physical custody over the children pursuant to the Texas divorce decree subject only to Father's visitation rights, the only clearly definable "custody" matter that could have appeared before the Indiana court would have been the divorce decree's appointment of Father as "Joint Managing Conservator". It therefore would have been within the discretion of an Indiana court (though not necessarily a CHINS court) to exercise jurisdiction to terminate Father's rights as "Joint Managing Conservator", thereby terminating his right, inter alia, to participate in the educational and religious decisions made on behalf of the children. See Tex.Fam.Code § 14.02 (Vernon 1986).
At best, the CHINS court's exercise of jurisdiction only incidentally related to the *189 issue of Joint Managing Conservatorship. Indeed, the issue was never directly addressed during the entire course of the CHINS proceeding. Rather, the primary issue throughout the proceeding was whether the visitation rights granted to Father in the Texas divorce decree should be modified or denied in light of the allegations of child molestation. Therefore, I.C. 31-1-11.6-14 barred the CHINS court from exercising jurisdiction without the consent of the Texas District court.[23] That consent was never given. It is perhaps noteworthy in this regard that our courts have repeatedly upheld the right of Indiana courts to exercise continuing jurisdiction and to refuse to find Indiana an inconvenient forum in the face of similar attempted incursions by the courts of other states.[24]See Clark, supra, 489 N.E.2d 90; Funk, supra, 457 N.E.2d 223; Benda v. Benda (1990) 1st Dist.Ind. App., 553 N.E.2d 159, trans. denied.
It might be argued that the termination of Father's parental rights in the "Termination of Parent-Child Relationship" proceeding necessarily included a termination of his rights as Joint Managing Conservator, and that the order of termination should be affirmed at least to this extent. However, we conclude that the order must be vacated because it was predicated upon the factual findings of the CHINS court and the termination court's conclusion that there was no reasonable probability that the conditions resulting in the CHINS determination would be remedied.
The CHINS proceeding was technically not a nullity, in that the court acted with the existence of a jurisdictional basis. However, the CHINS court abused its discretion in exercising subject matter jurisdiction over the dispute contrary to the mandates of I.C. 31-1-11.6, and therefore, the CHINS determination and dispositional order must be vacated. It follows that the CHINS court's subsequent expansion of jurisdiction to child support and insurance-related obligations "in the interests of the children" likewise constituted an abuse of discretion. Therefore, the court's finding of contempt for failure to pay child support must also be vacated. Finally, the order terminating Father's parental rights in the consolidated action must be vacated for the reasons stated above. The proceedings are hereby remanded to the Marion County Superior Court, Juvenile Division.
Upon remand, the Juvenile Court is directed to defer jurisdiction over visitation issues to the Texas District Court unless and until that court agrees to defer jurisdiction to the Marion County Juvenile court.[25]
The judgment of the Juvenile court is reversed and the cause is remanded for *190 further proceedings not inconsistent with this opinion.
BARTEAU, J., concurs in result and files separate opinion.
CHEZEM, J., dissents and files separate opinion.
BARTEAU, Judge, concurring in result.
I agree that the Juvenile Court's orders must be vacated, but only because the Juvenile Court did not base its exercise of jurisdiction on the emergency provision of the UCCJA, and because the Department did not argue on appeal that the emergency provision authorized exercise of jurisdiction. I emphasize that it is possible that a CHINS proceeding may be brought within the framework of the UCCJA. In re Lemond (1980), 274 Ind. 505, 413 N.E.2d 228.
I wish to emphasize also that there is nothing in this record to support an inference that the CHINS proceedings were a sham in order for Mother to engage in forum shopping. While it is stated that an implication should not be drawn that the CHINS proceedings were a sham, it is emphasized that Mother was the "motivating and guiding force and influence in the Indiana litigation." (180, n. 6) A CHINS petition can only be filed by the Department. The fact that a parent cooperates with the Department does not allow an inference that the parent is using the Department to forum shop, as is alluded to on page 183.
Further, the fact that Mother is cooperating with the Department does not mean that there is only a "formalistic" difference between Mother as the party to the Texas proceedings and the Department as a party to the Indiana proceedings, as is stated on page 187. Thus, I do not agree that "to the extent that the CHINS determination might be premised upon an emergency which could only be established by events which were the subject of the Texas litigation, the Indiana judgment is invalid." (187) The parties involved in the Texas litigation and the Indiana litigation are not the same.
However, because the Juvenile Court did not base its exercise of jurisdiction on the emergency provision of Ind. Code 31-1-11.6-3(a)(3), and because the Department did not argue that section's applicability on appeal, I agree that the judgment must be reversed.
CHEZEM, Judge, dissenting.
I respectfully dissent. I agree with the Majority that one purpose of the Uniform Child Custody Jurisdiction Act (UCCJA) is to avoid the repeated litigation of custody matters. Matter of Lemond (1980), 274 Ind. 505, 413 N.E.2d 228, 245. I further agree that the CHINS statute, Ind. Code 31-6-4-3, "is intended to enable the government to respond to emergency situations involving children unlikely to be helped without court intervention." However, I do not agree that the CHINS statute can only operate within the confines of the emergency provision of the UCCJA when the children involved are children of divorced parents.
I.C. 31-6-2-1(a)(2) grants exclusive jurisdiction to a juvenile court in proceedings in which a child, including a child of divorced parents, is alleged to be a child in need of services. In addition, I.C. 31-6-4-3(a) deems a child to be in need of services if the child is not yet eighteen (18) years old and ... (3) the child is a victim of a sex offense... . Interpretation of the CHINS statute by this Court also lends support to the majority's statement that the statute enables the government to respond to emergency situations. In Matter of E.M., (1991), Ind. App., 581 N.E.2d 948, 953, trans. denied, we stated "[w]hen parents neglect, abuse or abandon their children, the state has the authority under its parens patriae power to intervene."
In the present case, Father is alleged to have sexually abused E.H. and L.H. during court ordered visits with them in Indiana. The Marion County Department of Public Welfare (DPW) filed a request to file a petition alleging that the children were children in need of services. The court examined the preliminary inquiry, investigation report and affidavit, and determined probable *191 cause existed for the filing of the CHINS petition. The DPW followed the proper procedural steps for establishing jurisdiction in a CHINS proceeding, and the juvenile court properly exercised this jurisdiction.
The Majority puts forth that the juvenile court did not have jurisdiction to act because this was not an "emergency" situation. However, I would argue that any situation where a juvenile court finds probable cause that a child is in need of services, and especially any situation where a child is in need of services because of sexual abuse, is an emergency situation. In light of the UCCJA, an emergency existed because Father still had unsupervised visits with the children in Indiana and the children had been subjected to abuse from him. I.C. 31-1-11.6-3(3)(B). As such, the juvenile court had jurisdiction over the children until it determined they were no longer in need of services. I.C. XX-X-X-XX(c).
The Majority also states the CHINS court abused its discretion in exercising jurisdiction over the case because the DPW pursued the same remedy against Father that Mother had. However, the DPW does not bring a CHINS petition against a parent, but rather brings the petition in the name of the child who needs court-ordered services. Although both cases could have affected Father's visitation rights, the result of the CHINS case should not determine the jurisdictional outcome.
Even assuming for the sake of argument that the Texas visitation order was entitled to full faith and credit in Indiana under the UCCJA, the CHINS court properly exercised its jurisdiction. The State has a compelling interest in protecting the welfare of children. Matter of E.M., 581 N.E.2d at 952. The full faith and credit clause does not require Indiana to apply Texas law in violation of its own legitimate public policy. Brandon and David Lucas v. Estate of Peter A. Stavos (1993), Ind. App., 609 N.E.2d 1114. The CHINS court exercised its jurisdiction to protect E.H. and L.H., children living within the borders of Indiana.
I would affirm the judgment of the juvenile court.
NOTES
[1] Appellees challenge appellant's brief for non-compliance with Indiana Appellate Rule 8.3., a rule enacted primarily for the convenience of the court. Imposition of the sanction of waiver is discretionary. Suess v. Vogelgesang (1972) 2d Dist., 151 Ind. App. 631, 281 N.E.2d 536. In the instant case, the errors noted by the appellees do not hamper our ability to efficiently review the case. Furthermore, the appellees have not alleged that the errors in any way hindered their efforts to respond to appellant's allegations; nor is any such hinderance apparent upon the face of their brief. Therefore, we conclude that the appellant has not waived any of the issues presented for review.
[2] The Texas Family Code § 14.02(a) (Vernon 1986) provides that: "a parent appointed managing conservator of the child retains all the rights, privileges, duties, and powers of a parent to the exclusion of the other parent, subject to the rights, privileges, duties, and powers of a possessory conservator... ." A possessory conservator is a person exercising visitation rights over the child. Henry v. Rivera (1990) Tex. App., 783 S.W.2d 766, 768. See Tex.Fam.Code Ann. § 14.04(a) (Vernon 1986). Thus, a managing conservator is the child's primary custodian. Henry, supra. In this regard, we note that Tex. Fam.Code Ann. § 11.52(10) (Vernon 1986) defines "custody" as "managing conservatorship of a child".
[3] The parties hotly dispute whether Hasbrook discovered labial swelling with respect to L.H. at the November 10 visit. Upon direct examination, Hasbrook stated that L.H. did have labial swelling at that time. However, upon cross-examination, after questioning Hasbrook first as to his intentional withholding of medical records requested by Father pursuant to Father's legal rights, and second, as to the absence of any notation indicating labial swelling in his medical notes from the visit, the following colloquy occurred:

"Q (by Father's attorney) And on November 10th, did you observe any labial swelling in the vaginal area or the genitals of [L.H.]?
A (Hasbrook) No, that was on 12/7."
Record at 1525.
This latter statement was not the subject of redirect examination by the Department or cross-examination by Mother. The testimony as a whole thus leads inexorably to only one conclusion: that Hasbrook did not observe any labial swelling on L.H. until December 7, approximately five weeks after Father's contact with her.
[4] Between June 8 and August 4, 1989, the CHINS court held several additional hearings. Although the issue of jurisdiction was not discussed during any of these proceedings, an order dated June 8 stated, inter alia, that the court had jurisdiction. On June 25, the court again made written findings and conclusions in which it stated that it had jurisdiction.
[5] Indiana's version is entitled "Uniform Child Custody Jurisdiction Law," with the corresponding acronym being "UCCJL." However, because our discussion of the issues herein presented necessarily incorporates numerous references to both the UCCJL and the UCCJA in its generic sense and because there is no relevant difference between the two for purposes of this case, we will, for simplicity's sake, hereinafter refer to both as "UCCJA."
[6] We do not imply that the CHINS proceeding brought in the case before us was a sham or was in any way intended as a subterfuge. Nevertheless, to the author of this opinion, it is apparent from the record that Mother was and is the motivating and guiding force and influence in the Indiana litigation. The Department is the formal and necessary procedural instrument and vehicle by which that litigation has been conducted.
[7] It might be suggested that the fraudulent use of CHINS proceedings in Lemond created such an extreme factual backdrop as to color the Lemond court's analysis and therefore, to limit the precedential value of its holdings. However, the amicus brief filed in Lemond specifically addressed itself to that concern and was specifically answered by the court. We must therefore conclude that our Supreme Court consciously drafted Lemond in a way that it believed would create binding precedent. In any event, we are constrained to follow the pronouncements of our Supreme Court.
[8] Bramblett addressed the question whether the Grant Circuit Court could appoint a guardian over a child who was already under the jurisdiction of the CHINS court. P.B., cited in Bramblett, addressed the question whether the Elkhart Superior Court could enter judgment changing custody over children who were already within the CHINS court's jurisdiction, and Thompson addressed the question whether CHINS jurisdiction would override the probate court's jurisdiction to appoint a guardian if the CHINS jurisdiction had been properly invoked.
[9] In this regard it is not inappropriate to consider the necessary overlap and interrelationship among and between matters of "pure" custody and matters of visitation. See footnote 19 at page 186, infra.
[10] In Thompson v. Thompson (1988) 484 U.S. 174, 108 S.Ct. 513, 98 L.Ed.2d 512, the United States Supreme Court held that there was no cause of action in the Federal District Courts to determine which of two conflicting state custody decisions was enforceable under the PKPA. However, the Court clearly stated that state courts are bound to follow the PKPA as superseding federal law, and that failure to do so would be subject to reversal upon writ of certiorari. 484 U.S. at 182-84, 186-90, 108 S.Ct. at 518, 520. In doing so, the Court unmistakably placed upon state courts the obligation to honor the jurisdictional requirements of the Act and to give full faith and credit to the decrees of sister states.
[11] In Shute v. Shute (1992) Vt., 607 A.2d 890, Mother moved with Child from Vermont to Connecticut in May 1982, while Father remained in Vermont. In February 1983, Mother filed for divorce in the Lamoille Superior Court in Vermont. The Vermont Court issued a divorce decree in March 1984, which purported to award custody to Mother and visitation rights to Father.

When Father attempted to enforce his visitation rights under the order, the Vermont Supreme Court held that the Vermont Superior Court was without subject matter jurisdiction to enforce its prior decree with respect to the custody issue. The court reasoned that the original custody determination was inconsistent with the PKPA because Vermont was not the home state of the children when the divorce proceedings were commenced, and therefore, that the court could not exercise continuing jurisdiction over custody issues. Id. at 894. Conversely, the court noted that Connecticut  where Mother had initiated proceedings upon the same issues  would be under no obligation under the PKPA to accord full faith and credit to either the original Vermont custody determination or the proposed enforcement order. Id. This result is clearly consistent with our analysis.
[12] The Lemond court did not consider whether such an exercise of jurisdiction would violate the PKPA. It is true that one state has held that subsections (a) and (f) of the PKPA prevent states from modifying a custody determination of another state upon the basis of emergency jurisdictional provisions of state law. Via v. Johnston (1987) Ala. Civ. App., 521 So.2d 1324, 1326. On the other hand, the Ninth Circuit, in Thompson v. Thompson (1986) 9th Cir., 798 F.2d 1547, 1559 n. 19, aff'd, Thompson, supra, 484 U.S. 174, 108 S.Ct. 513, stated:

"Subsections (f) and (g) might be read to mean that so long as the first state had and retains jurisdiction, no other state may modify the first state's decree or enter a decree of its own, even though the child has been abandoned in the second state or there is an emergency involving actual or threatened abuse of the child. Another interpretation is that the second state is permitted to act in the limited situations in subsection (c) despite initial and continuing jurisdiction in the first state."
The ambiguity in the PKPA arises from the fact that the "modification of foreign custody determination" subsection does not expressly provide for authority to exercise jurisdiction to modify a foreign custody decree in emergency circumstances, even though the jurisdictional subsection provides for the existence of jurisdiction to protect the child in an emergency. In this respect, however, the PKPA substantively mirrors the UCCJA. In effect, the Lemond court adopted the Ninth Circuit's second interpretation in interpreting the emergency provisions of the UCCJA. Presumably, we would interpret the PKPA the same way.
[13] For a summary of the scheme see In re Custody of Cox, infra.
[14] The UCCJA provides two primary bases for the assertion of jurisdiction in the absence of any prior out-of-state proceedings: the "home state" test and the "significant connection" test. I.C. 31-1-11.6-3. Several of our cases have concluded that Indiana courts may not seek to exercise jurisdiction under the "significant connection" test if another state is established as the children's home state. In re Guardianship of Mayes (1988) 2d Dist.Ind. App., 523 N.E.2d 249, 251; In re Marriage of Hudson (1982) 4th Dist.Ind. App., 434 N.E.2d 107, 115, cert. denied (1983) 459 U.S. 1202, 103 S.Ct. 1187, 75 L.Ed.2d 433; see Funk v. Macaulay, infra at 226. We note, however, that these cases do not bar the exercise of continuing jurisdiction upon the basis of a continuing "significant connection" to the state, even though the "home state" test is no longer met.
[15] Unfortunately, experience with these provisions has shown that trial courts are often as unwilling to defer the exercise of continuing jurisdiction as they are to respect the decision of a competing court to exercise such jurisdiction. This problem has been exacerbated by the fact that state legislatures have incorporated modifications into their enactions of the UCCJA which have served to undercut the Act's purpose of creating a uniform national standard for determining subject matter jurisdiction over custody disputes. Indeed, these considerations led Congress to enact the PKPA. See PKPA, Pub.L. No. 96-611, § 7(a)(1) and (2), 94 Stat. 3566, 3568 (1980). Appellate opinions are beginning to use the PKPA to bring these individual state modifications of the UCCJA into line with the PKPA's uniform standard where the modification seeks to broaden the state's power to exercise jurisdiction beyond the limitations imposed by the Uniform Act. See, e.g., Shute, supra, 607 A.2d 890. Nevertheless, trial courts frequently continue to engage in jurisdictional turf battles apparently without regard for the binding effect and legislative purposes of the PKPA and UCCJA. We regret this fact and urge our courts to strictly follow the limits mandated by the PKPA and I.C. 31-1-11.6.
[16] In summary form, the dispositional alternatives available to the CHINS court are: 1) to order supervision of the child by the responsible government department; 2) to order the child to receive outpatient treatment or therapy; 3) to remove the child from his home, award wardship to any party, or emancipate the child; 4) to order a parent to receive counseling; or 5) to order a party to refrain from contacting the child. I.C. XX-X-X-XX.4 (Burns Code Ed.Supp. 1992).
[17] We do not separately address the question whether the Texas judgment is entitled to full faith and credit under the PKPA because we conclude that I.C. 31-1-11.6-13(a) imposes upon our courts the same substantive requirements as the PKPA with respect to the modification of foreign custody decrees.
[18] In Green v. Bruenning (1985) Ky.App., 690 S.W.2d 770, the Kentucky Court of Appeals refused to accord full faith and credit to a 1982 Texas custody decree. The court, following Kentucky Supreme Court precedent, held that because Texas had not at that time yet adopted the UCCJA, the Texas decree was not entitled to full faith and credit. The court further held that the PKPA required full faith and credit only where the custody determination of the sister state was consistent with that act and noted that both the UCCJA and the PKPA "are designed to prohibit a state from taking jurisdiction and determining custody where proceedings have already been instigated in another state". (Emphasis supplied) 690 S.W.2d at 771. The underlying rationale for the Green decision was not only that Texas had not yet adopted the UCCJA or the PKPA, but perhaps even more importantly that the Kentucky court obtained proper jurisdiction before the Texas court attempted to exercise jurisdiction. The Texas court's attempted exercise of jurisdiction, although consistent with the Texas law then in effect, was inconsistent with the UCCJA upon the underlying facts of the case. Thus, Green is consistent with the Marcrum analysis.
[19] The Department argues that the Texas statute does not substantially comply with the UCCJA because it distinguishes "visitation" from "custody" and allows Texas courts to retain jurisdiction only over "visitation" issues after Texas is no longer the home state of the children. See Tex.Fam.Code § 11.53(d) (Vernon 1986). The Department concludes that this deviation from the UCCJA permits Indiana to refuse to accord full faith and credit to Texas's custody determinations. Although Marcrum obviates the need to address this question, as discussed above, we reject the Department's argument on the merits.

In effect, Texas's statutory modification requires the Texas courts to show more deference to the courts of other states than the UCCJA requires. This limit imposed by the Texas Legislature upon its own courts is clearly consistent with the UCCJA's purposes of avoiding jurisdictional competition and conflict, promoting cooperation with the courts of other states, and assuring that litigation concerning the children ordinarily take place in the state with the closest connection to the children. See I.C. 31-1-11.6-1. The fact that Texas chose not to go further and prevent its courts from retaining jurisdiction over visitation issues does not vitiate this conclusion, and is presumably explained by Texas's desire to protect the interests of a non-custodial parent who may remain in Texas. It would be unjustifiable for us to cite this provision as grounds for denying full faith and credit to Texas custody decrees in general. It is perhaps noteworthy in this regard that the PKPA endorses state statutory modifications to the UCCJA that limit a state's authority to exercise jurisdiction beyond the minimum requirements of the UCCJA and the PKPA. See PKPA, supra, 28 U.S.C. § 1738A, subsection (c) (to be entitled to full faith and credit, a child custody determination must meet the substantive requirements of the PKPA and be consistent with the law of the determining state).
[20] It may be noted that the CHINS court was apprised at the outset of the hearing: 1) of the existence of the Texas custody decree; 2) that Mother had litigated the same or similar allegations in the Texas court approximately three months earlier before moving to voluntarily non-suit her claim; 3) that she had filed the same claim earlier in the Marion Superior Court, Civil Division; and 4) that the Texas court had issued an order restraining Mother from interfering with Father's visitation.

The CHINS court refused to admit the restraining order due to lack of foundation. However, it allowed Father to file the order as an exhibit to his motion to dismiss, and therefore, no doubt, considered it for jurisdictional purposes. See Behme v. Behme (1988) 1st Dist. Ind. App., 519 N.E.2d 578, 582 (the determination whether a court has subject matter jurisdiction entails an examination of the jurisdictional grant and does not ordinarily turn upon the technical intricacies of pleading).
[21] Even if the CHINS court could have acted under the provision, as opined by Judge Barteau, its ultimate exercise of jurisdiction far exceeded the scope of the provision's authorization.
[22] In reviewing the Texas District Court's refusal to defer jurisdiction over visitation issues, the Texas Court of Appeals did not elaborate upon the facts supporting the District Court's exercise of discretion. It is clearly not our role to justify or question its conclusion. Nevertheless, several facts were present to justify the Texas District Court's exercise of continuing jurisdiction, namely: 1) that Father continued to live and work in Texas; 2) that the court had already heard evidence upon the particular issues and had handled the divorce; 3) that the children's paternal grandparents, at least one witness competent to testify regarding Mother and Father's marital relationship, at least two expert witnesses (one for Mother and one for Father), and several Harris County, Texas Child Protection Services caseworkers familiar with the case all resided in Texas; and 4) that the records of the divorce proceedings were in Texas.
[23] In addition, I.C. 31-1-11.6-6 barred the CHINS court from exercising jurisdiction in the instant case. I.C. 31-1-11.6-6(a) provides:

"A court of this state shall not exercise its jurisdiction under this chapter if at the time of filing the petition a proceeding concerning the custody of the child was pending in a court of another state exercising jurisdiction substantially in conformity with this chapter, unless the proceeding is stayed by the court of the other state because this state is a more appropriate forum or for other reasons."
Although the Texas District Court granted Mother's motion to non-suit her case in December 1988, it retained jurisdiction over Father's counter-claims for modification of visitation and support. So far as the record reveals, those issues are still pending. Thus, I.C. 31-1-11.6-6 additionally required the CHINS court to refrain from exercising jurisdiction over these issues.
[24] One might imagine a case in which a Texas court's purported exercise of continuing jurisdiction over "visitation" issues so encroached upon "custody" issues that an Indiana court might determine that the Texas court's exercise of continuing jurisdiction exceeded its authority under Texas law. However, that is not the case here, where the Texas court has only attempted to dictate the terms of Father's reasonable visitation rights, pursuant to the Texas divorce decree still in effect.
[25] We do not rule out the possibility that the CHINS court might still exercise emergency jurisdiction over visitation issues pending the outcome of Texas proceedings upon the visitation issues if, considering all the circumstances surrounding this litigation, the Department is able to allege facts sufficient to establish a bona fide emergency in accordance with the criteria set forth herein. However, we emphasize that no such emergency may be found to exist except to the extent that a remedy is pursued in the Texas court with all due diligence.